906 So.2d 813 (2004)
Roger Cole RIDDICK, Appellant/Cross-Appellee,
v.
Patricia Waddell RIDDICK, Appellee/Cross-Appellant.
No. 2003-CA-00323-COA.
Court of Appeals of Mississippi.
December 14, 2004.
*816 J. Edward Rainer, Brandon, attorney for appellant.
Paul E. Rogers, Jackson, attorney for appellee.
EN BANC.
CHANDLER, J., for the Court.

ISSUES I THROUGH VI
¶ 1. Patricia Waddell Riddick Koestler filed a motion to increase child support payments. She also sought to invalidate the part of her marital dissolution agreement that reduced child support payments when the children began college as well as the portion of the agreement which allowed her former husband to cease making mortgage payments on the former marital home upon her remarriage. She charged her former husband with contempt for refusing to pay medical bills and refusing to pay their daughter's college tuition. Finally, she asked the court to order her former husband to make the car payments on their daughter's car. Her former husband, Roger Cole Riddick, counter-claimed, seeking to hold Patricia in contempt for alienating their children from him and for violating the morals clause of their marital dissolution agreement. He also sought custody of their minor children.
¶ 2. The chancellor granted Patricia Riddick Koestler's motion to increase child support payments, held that the agreement for Roger Riddick to pay reduced child support was void against public policy, ordered Roger to make the automobile payments on their daughter's car, and held Roger Riddick in contempt for not paying the daughter's tuition but declined to hold him in contempt for not paying the medical bills. The court denied Patricia's request to order Roger to continue to make mortgage payments after Patricia's remarriage, finding the contract to be a non-modifiable provision of the parties' property agreement. The chancellor denied Roger's requests to hold Patricia in contempt and denied Roger's request to change custody. Roger appeals, raising the following issues:
I. WHETHER THE COURT ERRED IN ORDERING ROGER TO PAY AN INCREASE IN CHILD SUPPORT OF TWENTY-FIVE PERCENT
II. WHETHER THE COURT ERRED IN DECLARING THE MARITAL DISSOLUTION AGREEMENT PROVISION REGARDING COLLEGE TO VIOLATE PUBLIC POLICY
III. WHETHER THE COURT ERRED IN REFUSING TO HOLD PATRICIA IN CONTEMPT FOR ALLEGEDLY ALIENATING ROGER FROM HIS CHILDREN
IV. WHETHER THE COURT ERRED IN REFUSING TO HOLD PATRICIA IN CONTEMPT FOR VIOLATING THE MORALS CLAUSE OF THE MARITAL DISSOLUTION AGREEMENT
V. WHETHER THE COURT ERRED IN HOLDING ROGER IN *817 CONTEMPT FOR FAILING TO PAY COLLEGE EXPENSES
VI. WHETHER THE COURT ERRED IN ORDERING ROGER TO MAKE PAYMENTS ON A NEW AUTOMOBILE WHEN HEATHER REFUSED TO ADHERE TO THE TERMS FOR OBTAINING A NEW VEHICLE
VII. WHETHER THE COURT ERRED IN AWARDING PATRICIA'S ATTORNEY'S FEES AND DENYING ROGER'S REQUEST FOR ATTORNEY'S FEES.
¶ 3. Patricia cross-appeals, raising the following issue:
I. WHETHER THE COURT ERRED IN HOLDING THAT ROGER'S OBLIGATION TO MAKE MORTGAGE PAYMENTS ON THE FORMER MARITAL HOME IS INTERPRETED TO CONSTITUTE A NON-MODIFIABLE PROPERTY SETTLEMENT PROVISION OF THE PARTIES' MARITAL DISSOLUTION AGREEMENT
¶ 4. We find reversible error with regards to issues I, II and V and reverse and render the chancellor's decision. We reverse and remand with regards to issue VI. We affirm with regards to issues III, IV, and VII and on cross-appeal.

FACTS
¶ 5. Roger Cole Riddick and Patricia Waddell Riddick Koestler were divorced on May 13, 1999, in the Chancery Court of Rankin County. The parties had three minor children, Jason Allen Riddick, born October 9, 1979[1]; Heather Renee Riddick, born March 6, 1983; and Stephen Tyler Riddick, born August 2, 1989. The court granted both parties joint legal custody.
¶ 6. From the time of the divorce until December 2001, Patricia, Heather, and Stephen were living in the former marital home. Roger was to make payments on the house. Patricia was to have exclusive use, occupancy, possession, and control of the house until Stephen reaches the age of twenty-one, or Patricia remarries, whichever comes first.
¶ 7. In August, 2001, Patricia moved into a new home in Clinton, which cost $166,000. She filed a motion for modification on September 10, 2001, where she asked for increased child support. She also claimed that the provisions of the original marital dissolution agreement were ambiguous and sought to have these provisions modified.
¶ 8. Roger counter-claimed, requesting that the court hold Patricia in contempt for violating provisions of the marital dissolution agreement. He alleged that Patricia intentionally caused an estrangement with Heather and that she attempted to do the same with Stephen. Roger alleged that Patricia failed to keep Roger informed of his children's educational pursuits and that she blocked Roger's access to Heather's school and medical records. He sought an order of contempt due to Patricia's violations of the morals clause of the marital dissolution agreement. He sought custody of Stephen on the grounds that Stephen's grades had significantly declined after Patricia's move to Clinton.[2]
¶ 9. On July 16, 2002, Patricia filed motions for contempt. She claimed that Roger failed to pay medical bills, failed to provide her with an explanation of benefits forms from the insurance company, and refused to pay for Heather's college expenses.

*818 PROCEDURAL HISTORY
¶ 10. The chancellor issued his opinion denying Roger's request for a change of Stephen's custody. He found that Patricia's move was a "material change in circumstances," but did not find any proof that Stephen's welfare was adversely affected.
¶ 11. On Patricia's motion to increase child support, the chancellor increased Roger's child support obligation by twenty-five percent, from $1,000 per month to $1,250 per month for each child, retroactive to September, 2001. This increase in child support was based on the chancellor's "judicial notice of the increased needs, after almost three and one-half years, of children ages nineteen and thirteen. This holding was also based on an increase of Roger's monthly net income of twenty-eight percent. Moreover, the evidence showed their needs to have increased." The chancellor ordered that the child support shall continue until Heather reaches age twenty-one or is otherwise emancipated.
¶ 12. The original marital dissolution agreement provided that Roger would not owe Patricia child support during any month that Heather or Stephen was enrolled in college and not living in Patricia's house. If a child attended college but lived with Patricia, Roger's child support would decrease to $500 per month. Patricia believed that this provision of the marital dissolution was contrary to law and requested the chancellor to declare that the provision violated public policy. The chancellor agreed and ordered Roger to pay Patricia $1,250 per month for Heather's support regardless of whether she is attending college and regardless of whether she lives full-time with Patricia. The chancellor reasoned that the obligation to pay child support "is not eliminated just because a child undertakes a post-secondary education, even if the child does not live full-time in the home of the custodial parent during such schooling."
¶ 13. The court denied Roger's motion for contempt for Patricia's allowing her then-boyfriend and current husband to stay overnight with Patricia. The chancellor reasoned that any violation did not adversely affect the children. The chancellor also noted that Roger exposed Stephen to the same situation when Stephen, Roger, and his then-girlfriend, currently his wife, all stayed in the same condominium while on vacation. The chancellor also declined to hold Patricia in contempt for allegedly alienating the children from Roger.
¶ 14. The chancellor required Roger to buy a new car for Heather. In 2000, Roger agreed to buy Heather a 2000 Oldsmobile Alero and make payments on the car if Heather maintained good grades in college, obtained a part time job, and agreed to visit Roger more often. Heather did not fulfill her end of the bargain, but the chancellor ordered Roger to pay for the new vehicle on the grounds that Roger is not allowed to contract away his obligation to provide a reasonable means of transportation for Heather.
¶ 15. Despite evidence showing that Patricia failed to provide Roger with any information regarding Heather's college, other than sending him the bills for tuition and her subsequent citation for contempt, the chancellor found Roger to be in contempt and ordered him to pay Heather's educational expenses. The chancellor did not, however, find Roger to be held in willful contempt. The chancellor also declined to hold Roger in contempt for failing to pay medical expenses.

ANALYSIS

I. WHETHER THE COURT ERRED IN ORDERING ROGER TO PAY AN *819 INCREASE IN CHILD SUPPORT OF TWENTY-FIVE PERCENT
¶ 16. The chancellor ordered a twenty-five percent increase in Roger's child support payments, from $1,000 per month to $1,250 per month, per child. When a petitioner is seeking a financial modification, she must show a material change in circumstances. Elements that may be considered include (1) increased needs caused by advanced age and maturity of the children (2) increase in expenses, and (3) inflation factor (sic). Other factors include (4) the relative financial condition and earning capacity of the parties, (5) the health and special needs of the child, both physical and psychological, (6) the health and special medical needs of the parents, both physical and psychological, (7) the necessary living expenses of the father, (8) the estimated amount of income taxes the respective parties must pay on their incomes, (9) the free use of a residence, furnishings, and automobile and (10) such other facts and circumstances that bear on the support subject shown by the evidence. Lawrence v. Lawrence, 574 So.2d 1376, 1382 (Miss.1991). Roger believes that the court erred in considering only his increased income and the increased needs of the children when deciding to award increased child support. We decline to hold the chancellor in error for not discussing every conceivable factor in deciding to increase Roger's child support obligation. The touchstone holding in Lawrence was as follows: "We find that the better rule is to allow modification amounting to an increase in child support as of the date of the petition to modify or thereafter, within the sound discretion of the trial court." Id. at 1384.
¶ 17. Although a chancellor is not required to consider every conceivable element in deciding to adjust child support, and while this Court shall show deference in reviewing the chancellor's holding, the modification of support shall not be taken lightly. When a divorce becomes final, "the custody, support, alimony, and property settlement agreement becomes a part of the legal decree for all legal intents and purposes." Switzer v. Switzer, 460 So.2d 843, 845 (Miss.1984). Consequently, the agreement can be modified only if a party can show "a substantial or material change in the circumstances of one or more of the interested parties: the father, the mother, and the child or children, arising subsequent to the entry of the decree to be modified." Tedford v. Dempsey, 437 So.2d 410, 417 (Miss.1983). Moreover, the material change in circumstances must be something that is not "anticipated at the time of the entry of the original decree." Trunzler v. Trunzler, 431 So.2d 1115, 1116 (Miss.1983).
¶ 18. Patricia believes that increased child support is justified because Roger's net monthly income increased by twenty-eight percent, from $9,953 per month to $12,696 per month. After the divorce, Roger's income tax obligations decreased due to the change in his marital status. Roger's lower tax obligations resulted in a higher net income. While his net monthly income has indeed increased substantially, his adjusted gross monthly income has increased by less than three percent, or $507, per month. Patricia argues that the increase in child support is justified because it is within the child support guidelines of Mississippi Code Annotated § 43-19-101 (Rev.2000). However, these child support guidelines ask the court to consider the parent's adjusted gross income, rather than his net income. Miss.Code Ann. § 43-19-101 (Rev.2000). Since Roger's gross income increased only slightly, we find that his modest increase in adjusted gross income does not justify a twenty-five *820 percent increase in child support payments.
¶ 19. The chancellor considered the advanced age of the children and Patricia's testimony regarding the increased needs of the children. The increased expenses Patricia referred to include Stephen getting involved in sports, providing a vehicle for Heather and the maintenance on that vehicle[3], a higher grocery bill, and more expensive clothes for her children. She has not documented any of these expenses. General allegations of increased needs or expenses will not suffice. Expenses must be proved with particularity. Magee v. Magee, 755 So.2d 1057, 1060 (¶ 11) (Miss.2000); Mullen v. Mullen, 246 So.2d 923, 924 (Miss.1971). Moreover, assuming Patricia's claims that her expenses increased are true, we are unable to see how these expenses were unanticipated at the time of the divorce decree.
¶ 20. The evidence also shows that most of Patricia's expenses actually decreased between the final decree of divorce and the hearing before the chancellor. Some of her bills that decreased included her yard expenses, her water and sewer bills, her laundry bills, her car insurance, her church donations, her pet expenses, and payments for Stephen's braces. She testified that her bills for food and clothing were lower, even though she claimed to need more money for these bills. Some of her bills did increase. She paid slightly more per month for home maintenance and medical bills. Altogether, her net monthly expenses decreased by $993, according to her testimony.
¶ 21. Some of Patricia's other bills did increase. In the time before her petition to modify child support was filed, she bought a new home, making a $10,000 down payment, and she bought an $11,000 Jeep. Her monthly telephone bill increased from $230 to $295, but this increase was due to an additional cell phone that she testified she did not need. Her increase in auto payments increased from $507 per month to $751 per month. This increase was due to the purchase of a second car, which she testified that she did not need. She admitted that if she had remained in her marital home, she would not have had a house note. Patricia concedes that these expenses cannot be used in adjusting child support. While we disagree with Roger that the chancellor erred in considering only Roger's increased income and the advanced age of the children in deciding to modify Roger's child support, we fail to see what material change in circumstances existed to support a twenty-five percent increase in Roger's child support. We accordingly reverse and render this portion of the chancellor's holding, reinstating Roger's obligation of $1,000 per month, per child. Roger shall receive credit for the excess child support payments he has made, which began in September, 2001. The excess payments will apply to his future monthly child support obligations.

II. WHETHER THE COURT ERRED IN DECLARING THE MARITAL DISSOLUTION AGREEMENT PROVISION REGARDING COLLEGE TO VIOLATE PUBLIC POLICY
¶ 22. The particular provision at issue is VI.(A)(4) of the parties' marital dissolution agreement. This provision provides:
VI. Child Support. (A)(4) ... [I]t is agreed between the parties that when the said children became enrolled in college that the Husband shall not owe monthly child support to Wife during the months a child does not live in the *821 residence of the Wife. However, during those months that the children are in college and live in the residence of the Wife, and while they are under the age of twenty-one years and not subject to any of the other provisions for termination of child support mentioned above, then the monthly child support shall be paid by Husband to Wife in the sum of $500.00 per month per child as college lodging and meal expenses of the child(ren) in college.
¶ 23. The chancellor held this provision to be invalid. He stated that parents may not contract to terminate child support prior to the child's twenty-first birthday. Lawrence v. Lawrence, 574 So.2d 1376, 1381 (Miss.1991). He also held that parents' efforts to contract away rights vested in minor children would be against public policy. Calton v. Calton, 485 So.2d 309, 310 (Miss.1986).
¶ 24. The chancellor's characterization of Roger's reduced obligations as an attempt by Roger to contract away his obligation to support Heather was manifest error. Roger agreed to pay for Heather's college expenses, including full expenses for her room and board. Any reduction in child support would therefore not adversely affect Heather. It is also noteworthy that Roger is not relieved of paying the full amount of his child support during any month that either child is not enrolled in college.
¶ 25. The chancellor declared Roger's obligation to provide reduced child support was in violation of public policy. This holding was in contradiction of precedent set by the Mississippi Supreme Court. In Sumrall v. Munguia, 757 So.2d 279, 283 (¶ 18) (Miss.2000), the Mississippi Supreme Court affirmed a marital dissolution agreement that allowed the husband to suspend child support payments during the months the children were away at college. The court found that the husband's child support payments of $1,200 per month were "still very liberal." Id. Similarly, Roger pays generous child support payments to Patricia each month. These payments are inconsistent with a chancellor's finding that Roger attempted to contract away his obligations to support his children. The agreement was a provision approved by the Rankin County Chancery Court, at the time the divorce was final. We are unable to affirm the chancellor's holding that Roger's reduced child support obligations is void against public policy. To do so would undermine the Mississippi Supreme Court's holding in Sumrall v. Munguia, as well as this Court's holding in Kirkland v. McGraw, 806 So.2d 1180, 1183 (¶ 7) (Miss.Ct.App.2002).
¶ 26. Roger also reminds this Court that a divorce agreement is no different from any other contract. East v. East, 493 So.2d 927, 931-32 (Miss.1986). When parties in a divorce proceeding have reached an agreement that a chancery court has approved, the agreement will be enforced unless fraud or overreaching is found. Bell v. Bell, 572 So.2d 841, 844 (Miss.1990). The Mississippi Supreme Court has taken a dim view of efforts to modify such agreements. Ivison v. Ivison, 762 So.2d 329, 334 (¶ 14) (Miss.2000). In light of these holdings, and in light of the fact that we have found the chancellor's holding to be manifestly erroneous, we must affirm the part of the marital dissolution agreement that allows Roger to pay reduced child support while the child(ren) are in college. Roger shall receive credit for the excess child support payments he has made. The excess payments will be credited towards future child support payments.

III. WHETHER THE COURT ERRED IN REFUSING TO HOLD PATRICIA IN CONTEMPT FOR ALLEGEDLY *822 ALIENATING ROGER FROM HIS CHILDREN
¶ 27. "[C]ontempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than we are." Morreale v. Morreale, 646 So.2d 1264,1267 (Miss.1994); Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990)
¶ 28. Roger argues that through Patricia's actions, she has attempted to eliminate any significant parental rule, influence, or guidance from Roger and to injure the children's opinion of Roger. Roger cites instances in which Patricia called Roger derogatory names in front of the children such as "pimp" and "sperm donor." He also asserts that Patricia has tried to insert Patricia's current husband, Carl Koestler, into Stephen's life as a father figure. Roger also alleges that Patricia refuses to let Stephen call his father, has told the children that Roger abandoned the children, and has interfered with Roger's attempts to include the children in activities with him.
¶ 29. Even though Patricia clearly has much disdain for her ex-husband, and this disdain influences the children's opinions of Roger, the chancellor was within his discretion to decide not to hold Patricia in contempt. There was testimony showing that Patricia actually encouraged Heather to cultivate a relationship with her father. Patricia encouraged Roger to take Heather out to dinner once a week and spend one-on-one time with her, but Roger has not made such an effort. Roger invited Heather to vacation with him and his then-girlfriend in Gulf Shores, but Heather chose not to go with Roger's girlfriend, her children, and her children's friends because she did not feel comfortable in that situation. Patricia encouraged Heather to go with him by telling her that she could take her own car, and when she became uncomfortable, she could leave.
¶ 30. Roger and Heather have a strained father-daughter relationship. Roger believes that this strained relationship is a result of Patricia's derogatory language about Roger and her interference with Roger's relationship with his daughter. The chancellor, however, found that "so much of what [Roger] has cited as evidence that [Patricia] has tried to turn Heather against him is in reality evidence of his having done that very well himself." The record supports such a finding. After Roger helped buy a car for Heather, he demanded that Heather get a part-time job. He gave Heather one week to find a job, and if she didn't find one then she could work at his law firm. After the week had passed, Roger called Heather because she was supposed to come work for him. Heather went to the office and told Roger that she was not going to work for him. Roger told Heather that she needed to leave the car keys with him. When she refused, the police were called to escort Heather out of the office building. Since that incident, Heather has not returned to see her father. Roger has also alienated Heather by accessing her school records without notifying Heather. Although Roger is correct that he has the rights to view these records, the fact remains that Heather is embarrassed by Roger's attempts of obtaining her records, and Roger's actions alienate Heather from him. In one instance, Roger contacted the dean to get Heather's grades, who in turn requested information about Heather's grades and school attendance from her teachers. This incident embarrassed Heather because she did not want anyone to know about her problems at home.
¶ 31. The evidence also shows that Patricia has done nothing to alienate Stephen *823 from his father. Stephen and Heather both mentioned in their testimony that they harbor a certain resentment for all that Roger does for his stepchildren as compared to what he does for them. In other words, there is evidence that Stephen's relationship with Roger and his opinion of Roger is affected by Roger's actions towards Stephen. Roger's own expert witness, Ms. Brenda Donald, admitted that she could not recall any instances by Patricia that suggests that Patricia is alienating Stephen from his father. Ms. Donald also admitted that Stephen loved his father and that his relationship with Roger is better now than it was at the time of the divorce. Even though Patricia says that her new husband is like a father to Stephen, this statement does not necessarily alienate Stephen from Roger. After all, Roger's new wife also says that Stephen is like a son to her, and Roger would certainly not believe that his wife is trying to insert herself as a new mother to Stephen.
¶ 32. In order to prove Patricia's alienating conduct, Roger hired two expert witnesses to demonstrate examples of Patricia's conduct and the effect this conduct has on the children's relationship with Roger. Roger relies heavily on these witnesses for the purpose of this appeal. Brenda Donald, a clinical social worker, who met with the Riddicks through the time of the divorce, testified as to several examples of alienating conduct. She testified that Patricia refuses to let Stephen call his dad, and his mom listens when he talks on the phone to his father. She testified that Stephen began blaming his dad when Patricia told him that Roger abandoned him. She testified that Patricia would give malicious intentions for Roger's behavior to the children. Ms. Donald testified that as long as Patricia is angry, Stephen would not say anything positive towards Roger. Ultimately, she testified that in her opinion Patricia has been engaged in an ongoing campaign of alienating the children.
¶ 33. Some of Ms. Donald's testimony concerned Patricia's attitude towards Roger generally, and much of this behavior has little if anything to do with Patricia's alienating the children from Roger. For example, she related one instance in which Patricia deliberately wrecked Roger's car and later reacted with pride that she had done it. This type of behavior, while shameful,[4] is not relevant to Patricia's efforts to alienate the children from Roger. Other parts of Ms. Donald's testimony were later discredited. She testified that Stephen displayed anger towards Roger in part for his own actions. Stephen showed anger towards Roger because he failed to answer Stephen's telephone calls and would not return Stephen's calls. She testified that Stephen related instances to her when his father was not truthful with him. Finally, her testimony shows contradictions from her ultimate opinion that Patricia has attempted to alienate the children. She could not recall anything specific suggesting that Patricia was alienating Stephen from his father. She also testified that Stephen's relationship with Roger is better than it was before the divorce. With respect to Heather, Ms. Donald testified that Heather and Roger do not enjoy a positive a relationship and never have enjoyed a positive relationship.
¶ 34. Roger also hired Dr. Wood Hiatt, a psychiatrist, for the hearing for the purpose of proving Patricia's alienating conduct. Dr. Hiatt reviewed the legal pleadings of both the divorce and the modification motions, and interviewed Roger to learn the background of the litigation. *824 He also conferred with Ms. Donald. Dr. Hiatt described Patricia's conduct as a "deliberate attempt to diminish and damage the relationship of a child with a parent. Both a deliberate, systemic attempt to do so. I believe the record abundantly supports the evidence that the mother has deliberately attempted to damage the reputation and the standing and the integrity of the father in the eyes of the children, thus, in effect, she had embarked on a campaign of character assassination." Dr. Hiatt's testimony was also discredited. Dr. Hiatt testified that Stephen appears to have "a full, rich relationship with both parents." Dr. Hiatt testified as to what was in the best interest of the children even though he had not spoken with either child. He testified that it would be in Stephen's best interest to live with Roger even though he admitted that Stephen said that his mother gives better care and pays more attention to his needs. He believed that Heather would be better suited in Roger's custody even though, in his own words, there is "severe conflict" between the two.
¶ 35. The chancellor gave little weight to Roger's expert witnesses. He found that they contradicted themselves and each other. The chancellor also believed that both Dr. Hiatt and Ms. Donald were "overly influenced by the $2,500.00-per-day [for Dr. Hiatt] and the $1,000.00 [for Ms. Donald] Roger paid them ... for sitting through the trial and testifying." We are unable to reweigh the evidence or disturb the chancellor's findings regarding the credibility of Roger's experts. The chancellor was in "a better position than this Court to judge the veracity of witnesses and credibility of evidence." Lee v. Lee, 798 So.2d 1284, 1291 (¶ 29) (Miss.2001). The chancellor's decision to refuse to hold Patricia in contempt was within his sound discretion.

IV. WHETHER THE COURT ERRED IN REFUSING TO HOLD PATRICIA IN CONTEMPT FOR VIOLATING THE MORALS CLAUSE OF THE MARITAL DISSOLUTION AGREEMENT
¶ 36. Under Section 11(c) of the marital dissolution agreement, the parties contractually agreed to a morals clause, which provided:
Neither the husband nor the wife shall allow their minor children to sleep overnight in a place where either the husband or wife shall have a friend of theirs with whom they have a romantic or sexual interest.
¶ 37. Roger alleged that Patricia violated the morals clause by allowing Carl Koestler, then a boyfriend, to stay overnight while both Heather and Stephen were present. Although the chancellor found that Patricia technically violated the terms of the morals clause, the chancellor declined to hold Patricia in contempt because the sleeping arrangement had no adverse effect on Stephen or Heather. Stephen testified that when Carl came over and stayed overnight, he slept on the couch. A chancellor does not have to hold a party in contempt even if he or she technically violated the law: "This Court can see no benefit in rendering a judgment of contempt against [the alleged contemnor], even though it would be appropriate under the law." Smith v. Smith, 545 So.2d 725, 728 (Miss.1989). The purpose of holding a party in civil contempt is "to coerce action or non-action by a party." Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss.1987). Since Patricia is now married to Carl Koestler and is not currently violating the morals clause, there is no legitimate purpose of finding Patricia in contempt.
¶ 38. The evidence also shows that Roger was also in violation of the morals clause and exposed Stephen to a *825 similar situation. On one occasion, he and his girlfriend stayed in the same condominium with his girlfriend's children and Stephen. In a court of equity, there is a maxim that hold that "he who comes into equity must come with clean hands." Brennan v. Brennan, 605 So.2d 749, 752 (Miss.1992). The Mississippi Supreme Court has adopted the meaning of the maxim to be that "no person as a complaining party can have the aid of a court of equity when his conduct with respect to the transaction in question has been characterized by wilful inequity." Id. The "clean hands" doctrine is a defense to a civil contempt charge for violating a provision of a marital dissolution agreement. Vockroth v. Vockroth, 200 So.2d 459, 463 (Miss.1967). The chancellor did not err in denying Roger's motion to hold Patricia in contempt for violating a clause that Roger violated himself.

V. WHETHER THE COURT ERRED IN HOLDING ROGER IN CONTEMPT FOR FAILING TO PAY COLLEGE EXPENSES
¶ 39. In their marital dissolution agreement, Roger agreed to pay the educational expenses for his children. This agreement is stated in VI(D) of the marital dissolution agreement and reads:
Husband agrees to pay the reasonable and necessary college expenses of the children of the parties until they reach twenty-one years of age or obtain a college bachelors degree, which ever shall occur first, if the children display an aptitude and inclination to attend college. Said expenses shall include, but not be limited to the cost of tuition, transportation, books, dormitory lodging, clothing, meals, matriculation fees and lab fees. The parties agree that they shall each fully pursue, cooperate and use their best efforts in applying for and obtaining any and all scholarships and grants available to the children to decrease and defray the college expenses of the children. The child attending college shall have the right to reasonable input on where he/she goes to college; however, the parties agree that since the Husband will be paying the college expenses of the children, he shall have the ultimate right to choose the college the children shall attend.
¶ 40. Roger asserts that the court erred in finding him in contempt for refusing to pay for expenses incurred by Heather at Hinds Community College for the spring, 2002 semester. In January 2002, Roger sent a letter to Patricia stating that he was willing to pay for Heather's college expenses at Hinds for the spring semester of 2002 and inquired as to whether Heather was enrolled at Hinds. The evidence proved that Roger did not know about Heather's enrollment until March 6, 2002, when Patricia sent him a tuition bill from Hinds. Patricia admitted that she did not respond to Roger's January letter except to have Roger cited for contempt. Roger asserts that he was simultaneously charged with contempt when he received Heather's bill from Hinds, although the record shows that Roger was not cited for contempt until July 16, 2002. Regardless, Roger wanted to wait to pay for Heather's expenses until after the chancellor's opinion, which was delivered on October 4, 2002. He did so because he was upset that neither Patricia nor Heather were keeping Roger informed of Heather's educational pursuits and believed that they were breaching their part of the agreement by not allowing Roger's input on Heather's educational decisions.
¶ 41. On the evidence, the chancellor held Roger in contempt for not paying, but he refused to hold Roger in willful contempt because Patricia and Heather failed to keep Roger informed regarding Heather's *826 academic pursuits. The chancellor also awarded Patricia attorney's fees for successfully proving her motion for contempt. In his ruling, the chancellor apparently believed that Roger refused to pay Heather's college expenses. He stated, "[I]t is truly disturbing to note that Roger has shown himself willing to spend enough in attorney's fees and expert witness fees in this matter-upwards of $30,000-to almost send Heather through four years of college."
¶ 42. A citation of contempt is proper only when the contemnor has willfully and deliberately ignored an order of the court. Cooper v. Keyes, 510 So.2d 518, 519 (Miss.1987) (citing Millis v. State, 106 Miss. 131, 63 So. 344 (1913)). In this case, we are unable to find any willful refusals of Roger to comply with his agreement to pay college expenses. He did not pay Heather's tuition bill because he had a good faith belief that he could delay paying the bill until he understood his obligations in light of Patricia's breach of the agreement in refusing to cooperate with Roger and refusing to let him have any input on Heather's educational decisions. The evidence is devoid of any other reason Roger may have had for not paying Heather's tuition. The proof presented at trial shows that Roger always pays his child support; he paid Heather's expenses when she was enrolled at Holmes Community College; and he sent a letter to Patricia stating that he was willing to pay Heather's college expenses for the spring semester of 2002. Patricia admitted that as of March 6, 2002, Roger never refused to pay for Heather's spring, 2002, tuition because no one had ever asked him to pay this bill. The chancellor's decision to hold Roger in contempt was manifestly erroneous.

VI. WHETHER THE COURT ERRED IN ORDERING ROGER TO MAKE PAYMENTS ON A NEW AUTOMOBILE WHEN HEATHER REFUSED TO ADHERE TO THE TERMS FOR OBTAINING A NEW VEHICLE
¶ 43. In the marital dissolution agreement, Roger is obligated to provide "reasonable means of transportation ... to the child while in college." In September of 2000, Roger agreed to pay for a 2000 Oldsmobile Alero for Heather provided that she comply with certain conditions. Heather agreed that she would go to Holmes Community College and make good grades, work part time, and use the car to see him on a more frequent basis.
¶ 44. Following the purchase of the car, Heather dropped out of college, quit work, and refused to go to the beach with him on Labor Day. Based on Heather's failure to live up to the agreement, Roger sent the payment booklet back to Heather, and she began paying the car note. The chancellor nullified this agreement between Roger and Heather and ordered Roger to make the payments on the Alero, finding that Roger's agreement with Heather does not discharge his obligation to provide transportation for Heather.
¶ 45. In nullifying the agreement between Roger and Heather, the chancellor mischaracterized the nature of their agreement. Roger did not refuse to provide transportation altogether for Heather but instead insisted and continues to insist on providing Heather with a 1994 Honda Civic, which remains available for her use. On appeal, Roger believes it is error for the chancellor to require him to provide a specific vehicle and to make payments on that vehicle. The Civic was purchased in 1999 for Heather. In 2001 Heather hydroplaned with the Civic, which resulted in an accident. For this reason, Patricia and *827 Heather believed that this car was unsafe.[5] However, there is no evidence that the car is unsafe except for Patricia's and Heather's statements calling it unsafe. The chancellor made no holdings regarding the safety of the Civic.
¶ 46. Roger and Patricia have joint legal custody of Heather. Mississippi Code Annotated § 93-5-24(5)(d) (Supp.2003) defines joint legal custody as follows:
"[J]oint legal custody" means that the parents or parties share the decision making rights, the responsibilities and the authority relating to the health, education and welfare of the child. An award of joint legal custody obligates the parties to exchange information concerning the health, education and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.
Roger uses this statute to argue that the chancellor abused his discretion in ordering Roger to pay for Heather's Oldsmobile. He argues that the chancellor's ruling invalidates the agreement between Roger and Heather, an agreement that he calls a "reasonable form of parental authority" that he is allowed to exercise by virtue of his joint legal custody of Heather. We agree. In the chancellor's opinion, he chastises Roger for "continuing to assert his prerogative of dictating where Heather goes to school and what she drives." Regardless of what the chancellor may think of the propriety of Roger's actions and decisions to influence Heather's life, the marital dissolution agreement entitles Roger to have such input. While the chancellor is correct in stating that Roger is not allowed to contract away his obligation to provide transportation for Heather, an order requiring Roger to make payments on a specific car goes beyond the terms of the marital dissolution agreement. We remand this issue to the chancery court to ascertain whether the Honda Civic is sufficiently safe for Heather to drive.

VII. WHETHER THE COURT ERRED IN AWARDING PATRICIA'S ATTORNEY'S FEES AND DENYING ROGER'S REQUEST FOR ATTORNEY'S FEES.
¶ 47. The attorney's fees for both parties were rather large because the majority of the time at trial was attributed to Roger's attempt to have the court modify the judgment with respect to custody of the children. The matter "grew tentacles and consumed six days of the Court's trial docket." The chancellor decided to award attorney's fees to Patricia because, while he did not find Roger's allegations to be completely baseless, "[t]he strength of his arguments simply did not justify the investment Roger made at trial in an effort to convince the Court, and Patricia's attorney fees were swelled in direct proportion as a result of having to defend herself." While Roger does not ask this Court to reverse the chancellor's rulings with regards to custody, he spends a great deal of time convincing this Court that his request to change custody was based on very strong evidence. He submits that Patricia's actions as a parent caused Roger to decide to seek a change of custody, and that she should be denied attorney's fees under the "unclean hands" maxim. We find this argument to be without merit. The fact of the matter is that Patricia's large attorney's fees were caused by the direct actions of Roger. Grogan v. Grogan, 641 So.2d 734, 745 (Miss.1994).
¶ 48. We affirm the chancellor's order requiring Roger to pay Patricia's attorney's fees. The Mississippi Supreme *828 Court "has consistently held that the matter of determining attorney's fees in a divorce action is largely entrusted to the discretion of the chancellor." O'Neill v. O'Neill, 501 So.2d 1117, 1119 (Miss.1987). Our jurisprudence also holds that "it is the function of the chancellor to weigh all of the facts and assess the circumstances and to award attorney's fees accordingly." Id. The evidence supports the chancellor's finding that Patricia is unable to pay her attorney's fees. At the time of the hearing, Patricia's adjusted gross income, excluding child support payments, was $1,258.86 per month. At the time, she was working as an assistant to U.S. Congressman Ronnie Shows, whose congressional seat has since been eliminated. Patricia did not work during most of the period of her marriage to Roger, and at age forty-four, her employment opportunities are relatively limited.
¶ 49. Roger submits that Patricia has an adequate and sufficient ability to pay attorney's fees. As proof, he cites the fact that Patricia netted more than $80,000 from the sale of the marital home. We find that this income, as well as any other money Patricia received as a result of the property settlement in the divorce, should not be considered as a factor in assessing Patricia's ability to pay her attorney. In deciding to grant Patricia's request for attorney's fees, the chancellor cited Adams v. Adams, 591 So.2d 431, 435 (Miss.1991), and held that Patricia should not have to invade the corpus of her property settlement. We find this case to be a correct application of the law. The chancellor held that Patricia should not be required to spend her limited personal income, nor should she be required to "invade the finite property settlement corpus derived from her years of marriage to Roger." We agree with this holding.
¶ 50. When the court denies a spouse's petition for contempt, no award of attorneys fees is warranted. Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990). Roger sought and continues to seek attorney's fees for his efforts to find Patricia in contempt. The chancellor denied this request because he failed to prove that Patricia was in contempt. We have affirmed these holdings. Accordingly, we deny Roger's requests for attorney's fees for his attempts to find Patricia in contempt. We have also found Patricia's motion for contempt for Roger's refusal to pay Heather's tuition bills to be without merit. However, we do not order Patricia to pay the attorney's fees she expended in attempting to hold Roger in contempt. The Mississippi Supreme Court has distinguished Cumberland. In Cumberland, the ex-wife petitioning the court for contempt had the ability to pay her attorney. Here, Patricia is unable to pay her attorney's fees. Fancher v. Pell, 831 So.2d 1137, 1140 (¶ 17) (Miss.2002). We affirm the chancellor's award of attorney's fees in full.
GRIFFIS, J., for the Court:

APPELLEE'S MOTION FOR ATTORNEY'S FEES ON APPEAL
¶ 51. In her brief, Patricia asks this Court to award her an attorney's fee for this appeal. Patricia cites Grant v. Grant, 765 So.2d 1263, 1268 (¶ 19) (Miss.2000) for the proposition that an appellate court "has generally awarded attorney's fees on appeal in the amount of one-half of what was awarded in the lower court." Since she was awarded $12,500 in attorney's fees at the trial court, Patricia urges this Court to award her the sum of $6,250 or one-half of what was awarded by the chancellor.
*829 ¶ 52. This Court has agreed with Roger, the appellant, on six out of eight issues presented in this appeal. Although Patricia correctly cites the "general rule" that an appellate court may award of one-half of the attorney's fee awarded by the lower court, this general rule is not absolute. Indeed, this Court retains discretion to award attorney's fees on appeal.
¶ 53. Patricia's assets are more than sufficient to pay her attorneys. The dissent argues that the only exception to the general rule is when a spouse is awarded permanent alimony. The dissent reasons that since Patricia was not awarded "permanent alimony" in the divorce then the exception does not apply.
¶ 54. The supreme court cited this exception to the general rule in the landmark case on the award of attorney's fees. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982). The McKee court refused to grant attorney's fee because the "award by the trial court was sufficient in our opinion for Mrs. McKee to compensate her attorneys for this appeal." Id. In our opinion, the award of $12,500 for attorney's fees to Patricia was sufficient to compensate her attorneys for this appeal.
¶ 55. Also, the McKee court cited the decision of Tighe v. Tighe, 239 Miss. 666, 124 So.2d 843 (1960), for the principle that "an exception to this rule exists when the permanent alimony awarded to the wife gives her sufficient means to meet the obligation of counsel fees on appeal." McKee, 418 So.2d at 767. Both Tighe and McKee were decided at a time when alimony was the only instrument or tool available to a chancellor to distribute marital property.
¶ 56. In 1994, the Mississippi Supreme Court recognized and adopted the concept of equitable distribution of marital assets. Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994); Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994). Now, chancellors in this state have several methods available to use in the dissolution of a marriage: (a) the equitable division of assets, Ferguson v. Ferguson, 639 So.2d at 933-35 (Miss.1994); (b) an award of periodic alimony, Armstrong v. Armstrong, 618 So.2d 1278,1280 (Miss.1993); and (c) an award of lump sum alimony, Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss.1988). Hence, the exception to the general rule may be applied when a spouse is awarded assets through the marital dissolution, not just when the spouse is awarded permanent alimony.
¶ 57. For these reasons, we deny Patricia's request for attorney's fees on appeal.
CHANDLER, J., for the Court as to the Cross-Appeal:
CROSS-APPEAL
I. WHETHER THE COURT ERRED IN HOLDING THAT ROGER'S OBLIGATION TO MAKE MORTGAGE PAYMENTS ON THE FORMER MARITAL HOME IS INTERPRETED TO CONSTITUTE A NON-MODIFIABLE PROPERTY SETTLEMENT PROVISION OF THE PARTIES' MARITAL DISSOLUTION AGREEMENT
¶ 58. The chancellor held that Roger's obligation to make the mortgage payments on the former marital home is a non-modifiable property settlement pursuant to the parties' marital dissolution agreement. Patricia believes that this holding is error because the payment of the house note was intended to be a form of child support for the minor children. The provisions at issue are III.(A) and III.(B)(4) of the marital dissolution agreement, which provides:

*830 III. (A). 1001 North Shore Village Drive, Brandon, Mississippi. The Husband and Wife jointly own a lot and residence located thereon at 1001 North Shore Village Drive, Brandon, Mississippi. The said property is more particularly described in that certain prior Warranty Deed to Husband and Wife recorded in the office of the Chancery Clerk of Rankin County, at Brandon, Mississippi, reference to which is hereby made in aid of and as part of the description of the said property. Husband and Wife agree that Wife shall be entitled to the use, occupancy, possession and control of said residence until she remarry, or Stephen Tyler Riddick reaches the age of twenty-one years, whichever shall first occur; and, upon the happening of the first of these events, the said property shall be placed on the market immediately by the parties and sold to the highest price for which the parties may agree to sell same.
III. (B)(4). The Husband shall pay the notes, principle (sic), and interest, owed on the refinanced loan(s), together with the taxes, insurance and yearly lease rental fees owed to the Pearl River Valley Water Supply District in connection with the said residence and property, until the residence and property is required to be sold according to the terms and conditions mentioned above in paragraph III(A), at which the time the balance of the loan(s) shall be paid according to the terms and conditions of said paragraph (III)(A) above.
¶ 59. Patricia argues that the language of these two provisions clearly shows an intent of the parties that the payment of the mortgage on the former marital home was intended as child support. We disagree. The parties' agreement on the division of real property is outlined in part III of the marital dissolution agreement, whereas the parties' agreement on child support is outlined in part VI of the marital dissolution agreement.
¶ 60. The marital dissolution agreement stated that "all provisions contained herein for the payment of debts, child support, or division of property is by way of property settlement and not alimony." Based on this phrase, Patricia believes that Roger's obligation to pay the mortgage was actually child support because she was not entitled to alimony. We disagree. The marital dissolution agreement calls for, among other things, an agreement by Roger to pay $180,000 to Patricia as a cash adjustment to the division of marital property, an agreement by Roger to pay for all of the marital debts that were contracted jointly, a provision that Patricia shall keep all of her personal effects and clothing, an agreement that Roger shall convey title to Patricia's 1998 Mitsubishi Montero, and an agreement that each party shall keep the property that is currently in his or her possession. These provisions cannot be construed as conveying a form of child support, because these property settlement provisions affect the financial well-being of the children indirectly if at all.
¶ 61. To support the position that a husband is required to make mortgage payments, Patricia relies upon Crum v. Upchurch, 232 Miss. 74, 98 So.2d 117 (1957). In Crum, the parties entered into an agreement in which the wife would have use of the marital home as long as the wife remained single. Id. at 119. When the wife remarried, the husband filed a petition to partition the property. The court held that the remarriage of the wife absolved the husband's obligation to pay alimony but did not release his obligation to furnish a home for his children. Id. The court affirmed the ruling of the lower court that the child support was to increase *831 from $75 to $100. Id. While Patricia concedes that this case is not directly on point, nor are there any Mississippi cases addressing the issue, she believes that the case is relevant because the purpose of the real property settlement provision was to provide for the children's welfare. Based on our reading of part III of the marital dissolution agreement, we are unable to make such an inference.
¶ 62. Even accepting Patricia's argument that the mortgage payments are a form of child support, we decline to find that Patricia needs Roger's mortgage payments in order to provide a home for Stephen. The record shows that Patricia netted more than $80,000 from the sale of the house. Patricia's profits from the sale of the house give her adequate funds to pay Stephen's housing expenses.
¶ 63. Patricia takes the position that the only two events that absolve Roger's liability on paying Patricia's housing costs are Patricia's remarriage and Stephen Tyler Riddick's twenty-first birthday. We disagree. After the marital home is sold and the mortgage is paid in full, there remains no obligation to pay the mortgage because the debt has been extinguished. Moreover, after the home was sold, Roger has paid and continues to pay debts associated with his obligation to pay the second mortgage. Nothing in the marital dissolution agreement states that Roger shall pay Patricia's housing costs until remarriage or until Stephen Riddick's twenty-first birthday. An order for Roger to pay Patricia's housing costs after the sale of the marital home would expand the words and language used in paragraph III of the marital dissolution agreement. If it were the intention of the parties for Roger to pay Patricia's housing costs until Patricia's remarriage, it should be incorporated in the marital dissolution agreement as a continuing obligation. Roger's obligation to pay the mortgage ended when the marital home was sold. We affirm the chancellor's ruling on this issue.
¶ 64. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REVERSED AND REMANDED IN PART ON DIRECT APPEAL AND AFFIRMED ON CROSS-APPEAL. APPELLEE'S MOTION FOR ATTORNEY'S FEES ON APPEAL IS DENIED. ALL COSTS OF THIS APPEAL ARE ASSESSED IN EQUAL PARTS TO THE APPELLANT AND THE APPELLEE.
AS TO ISSUES I, II, III, IV AND V, CHANDLER, J., FOR THE COURT: BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY.
AS TO ISSUE VI, CHANDLER, J., FOR THE COURT: BRIDGES, P.J., MYERS AND BARNES, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., AND ISHEE, J.
AS TO ISSUE VII PERTAINING TO THE AWARD OF ATTORNEY'S FEES AT TRIAL, CHANDLER, J., FOR THE COURT: BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY.
AS TO ISSUE VII PERTAINING TO APPELLEE'S MOTION FOR ATTORNEY'S FEES ON APPEAL, GRIFFIS, J., FOR THE COURT: LEE, P.J., BARNES AND ISHEE, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. CHANDLER, J., *832 DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, P.J., AND MYERS, J.
AS TO CROSS-APPEAL, CHANDLER, J., FOR THE COURT: BRIDGES AND LEE, P.JJ., MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. KING, C.J., NOT PARTICIPATING.
IRVING, J., NOT PARTICIPATING IN TOTO.
GRIFFIS, J., Concurring in Part and Dissenting in Part Issue VI:
¶ 65. I concur with the majority's decision on all issues except Issue VI.

VI. Whether the court erred in ordering Roger to make payments on a new automobile when Heather refused to adhere to the terms for obtaining a new vehicle.
¶ 66. Here, I agree with the majority that Roger is entitled to input in Heather's educational decisions and that the chancellor's decision to require a specific car goes beyond the terms of the marital dissolution agreement. However, I would reverse and render on this issue. I am of the opinion that no remand is necessary because the chancellor made no finding that the Civic was unsafe. I do not find sufficient evidence to support a finding by this Court to remand this issue for further consideration by the chancellor.
¶ 67. Accordingly, I concur with the majority's decision to reverse on this issue. However, I dissent from the majority's decision to remand.
LEE, P.J., AND ISHEE, J., JOIN THIS SEPARATE OPINION.
CHANDLER, J., Dissenting on Appellee's Motion for Attorney's Fees on Appeal:
¶ 68. An appellate court generally awards attorney's fees of one-half of what was awarded in the lower court. Grant v. Grant, 765 So.2d 1263, 1268 (¶ 19) (Miss.2000). An exception to this general rule exists when the permanent alimony awarded to the wife gives her sufficient means to meet the obligation of attorney's fees on appeal. This exception was first cited in McKee v. McKee, 418 So.2d 764, 767 (Miss.1982). The majority notes that, at the time McKee was decided, permanent alimony was the only available means of distributing marital property. Today, a chancellor has several methods available to divide marital property. Based on these new methods of dividing property, the majority believes it is appropriate to deny attorney's fees for this appeal. I believe that the facts and circumstances of this case make it appropriate to grant attorney's fees on appeal. I therefore dissent.
¶ 69. At the trial level, the chancellor awarded attorney's fees to Patricia because he did not believe it was appropriate for Patricia to invade the corpus of her property settlement in a divorce. We agreed with the chancellor's holding on this issue. At the appellate level, I believe it is equally important not to require Patricia to invade the finite corpus of her property settlement.
¶ 70. While this Court does not know the exact amount of money Patricia is obligated to pay her attorney for this appeal, the amount of attorney's fees she has expended in defending herself on this appeal is likely to be significantly more than the $6,250 she requests. Roger and Patricia appealed nearly every issue presented before the chancellor. Patricia's attorney submitted a thirty-eight page brief covering eight issues, as well as a three-page cross-reply brief.
¶ 71. Given the amount of time Patricia's attorney spent preparing this appeal, *833 there is little doubt that Patricia has incurred a significant debt in attorney's fees. For this reason, I believe it is appropriate to award attorney's fees on appeal. Furthermore, it is worth mentioning that the chancellor did not award all of Patricia's attorney's fees at the trial level. Patricia's attorney charged $15,477.29 for his services at the trial level. Patricia was required to pay approximately $3,000 of these fees because, at the time, she was employed, with a job that paid $1,258.36 per month. The month after the chancellor rendered his opinion, the Congressman for whom Patricia worked was re-districted out of his seat in Congress. Patricia currently has no monthly income, other than the child support payments that we have reduced at this appeal. For these reasons, I fail to understand the majority's holding that the $12,500 in attorney's fees Patricia received at the trial level would sufficiently compensate Patricia's attorney for this appeal.
¶ 72. While Patricia received a generous amount of money in the property settlement agreement, the chancellor held that this finite settlement should not be invaded. This holding was correct, and this logic remains equally true as Patricia generates additional debt for attorney's fees on appeal. I would grant Patricia's request for attorney's fees on appeal.
BRIDGES, P.J., AND MYERS, J., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Jason Riddick has since become emancipated by a court order dated October 3, 2000.
[2] Roger does not seek a change of custody on appeal.
[3] Since the chancellor later ordered Roger to pay Heather's car note and insurance on the car, this factor should not have been considered in deciding to increase child support.
[4] Both Patricia and Heather denied that Patricia bragged about the incident.
[5] The accident was apparently minor. The cost of repairs was approximately $500.