**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 1999-CT-02000-SCT**

*ANNIE MASON*

*v.*

*SOUTHERN MORTGAGE COMPANY*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/1999 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | BENTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES D. MINOR, SR. |
| ATTORNEY FOR APPELLEE: | B. SEAN AKINS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED IN PART - 08/01/2002 |
| MOTION FOR REHEARING FILED: | 9/3/2002; denied 10/24/2002 |
| MANDATE ISSUED: | 10/31/2002 |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Annie Mason appealed from the final judgment in her lawsuit against Southern Mortgage Company. The Court of Appeals reviewed the matter and rendered a plurality opinion which affirmed the trial court's judgment, but by a different rationale. We granted certiorari and find that the judgment of the trial court should be affirmed in part and reversed in part.

**I.**

**FACTS AND PROCEDURAL HISTORY**

a.

¶2. All of the evidence at the trial of this matter was adduced through the testimony of two witnesses, plaintiff Annie Mason and Boise McNeil, the president of Southern Mortgage Company. Their versions of events were often conflicting and sometimes ambiguous. While they named other people as being part of the story, no other witnesses were called to corroborate, rebut or add depth to their testimony. At the end of the trial, the trial court was neutral toward their credibility relative to one another.

b.

¶3. In January 1999, Mason decided to borrow money to pay off the existing mortgage on her home, plus pay some other debts and have additional money for home improvements. After seeing an advertisement for the company in the newspaper, she contacted Southern Mortgage Company ("Southern"). Southern is a mortgage originator, which is in the business of packaging loans and security instruments for sale to third parties. After Southern had received some financial information from Mason, she was notified to drive to Southern's branch office to sign the necessary documents.

¶4. On January 29, 1999, Mason signed several documents. In addition to a settlement agreement which detailed how the loan proceeds would be disbursed, Mason signed a document which conditioned funding of the loan on Southern's receipt of a satisfactory appraisal of her homestead. She signed a compliance agreement, whereby she agreed to "cooperate and adjust" for all documentation necessary for Southern to sell the mortgage. Mason also signed the deed of trust which would encumber her homestead as the collateral for the loan.

¶5. Mason signed the closing documents on a Friday. Under federal truth in lending laws, payout or funding of the loan could not occur until three days had passed. The loan would "fund" on the fourth day, counted as provided by federal law, meaning that on the fourth day the proceeds of the loan would be disbursed to Mason and the other parties designated in the settlement agreement.

¶6. During the waiting period, company president McNeil sent a check to his closing attorney. The attorney's job was to disburse those funds as provided in the settlement agreement. Accordingly, on February 3, the day before funding, the attorney sent a check for Mason's share of proceeds by means of next day delivery to Southern's branch office. Presumably also by means of next day delivery, the attorney sent a check to pay off Mason's prior mortgage and also to pay certain real property taxes she owed.

¶7. Although the exact time is not revealed by the record, problems arose about this time when Southern learned that its appraisal was inadequate to satisfy the third-party purchaser of Mason's loan. Southern put a halt to further disbursements pending receipt of a satisfactory appraisal. Mason testified that, after not hearing from Southern on the day of funding, she called the branch office the day after to inquire about her share of the loan proceeds. She was told that the loan would fund as soon as the appraisal arrived, and she was agreeable to that procedure. Southern's mortgage was placed on record the day after this conversation.

¶8. Mason testified that Southern told her a new or different story the following week. Apparently because the new appraisal placed a lower value on the collateral, she was told that she would have to sign new loan documents to receive any funds. Southern's McNeil testified otherwise, saying that the company stood ready to fully fund the original loan without additional documents. In any event, both sides agree that the loan was cancelled by mutual agreement in the days that followed. McNeil said that Southern was agreeable to this situation, provided the company was repaid the money it had advanced.

¶9. While Mason testified at one point that the deal was already cancelled by the time Southern's mortgage was placed on record, she also said she was agreeable to wait for the second appraisal because she had been assured that the loan would fund according to the agreement, without additional paperwork or modifications. Again, whatever may have occurred, there is no question that both parties agreed to walk away from their conditional agreement. Mason says she was unaware of the payoff of her prior mortgage, and so there were no immediate discussions about Southern's premature payment of her existing mortgage and the recording of their own. Those issues would soon arise.

¶10. After two or three weeks passed on approximately February 17, 1999, Mason discovered from her monthly bank statement that her old mortgage had been paid. On March 5, she was contacted by Southern's loan agent who told her that she needed to go back to her original mortgagee to have her old mortgage reinstated. McNeil testified that this was possible because the original mortgagee had been contacted and had agreed to help "undo" the situation. When Mason did not respond to this overture, the loan agent appeared at Mason's office with a deputy sheriff. McNeil said that the loan agent chose this method of encounter because of the now vociferous nature of the dialogue between Mason and the agent. The loan agent presented Mason with a form to sign for that purpose, but she never looked at it. With communications between the parties already clearly strained, this visit to Mason's office did nothing to improve relations. McNeil said that he called Mason the next day and her position was that she owed nothing.

¶11. This litigation ensued after Southern began procedures for non-judicial foreclosure of its mortgage. On June 30, 1999, Mason filed suit in Benton County Chancery Court to stop foreclosure which was set for July 5, 1999, and to have the mortgage declared void. She also asked for compensatory and punitive damages stemming from the above described events and for Southern's allegedly unconscionable origination fees.

¶12. Mason acknowledged during the trial that she owed money to Southern, but less her damages or expenses. Her position was that, instead of initiating foreclosure proceedings, Southern should have filed a lawsuit to settle the matter. After hearing this and the rest of the testimony of Mason and McNeil, the chancellor found in his bench ruling that both parties were at fault. He faulted Southern for "very sloppy" business practices, and he faulted Mason for not making an effort to repay the money by taking another mortgage or by using other means.

¶13. On November 5, 1999, the chancellor, noting that Mason had the benefit of Southern's money interest free for ten months, decreed that Mason would have thirty days to repay the money that Southern had advanced, a sum of $24,773.12. If Mason failed to repay the money, the final judgment decreed that Southern could foreclose its mortgage to recover that sum plus the cost of foreclosure. The chancellor deemed that Southern should be penalized by loss of the value of interest on the use of its money.

¶14. Mason appealed from the judgment without supersedeas. During the pendency of the appeal, she paid the amount due Southern under the judgment. Her argument on appeal was that Southern had made a mistaken but voluntary payment for which Mason suffered compensatory damages and that the facts supported punitive damages against Southern for intentional conduct.

¶15. The Court of Appeals affirmed the chancellor's judgment using a different analysis. First, the Court of Appeals determined that while Mason was unjustly enriched for a period of time at Southern's expense, Southern pursued the wrong remedy when it attempted to foreclose a mortgage which had been mutually annulled before foreclosure proceedings began. The Court of Appeals then stated Mason's proper claim was for slander of title. Due to her failure to make an effort to mitigate damages, however, the Court of Appeals found Mason was not entitled to substantial damages. The Court of Appeals held the chancellor's judgment to award Mason the value of interest free use of Southern's money for a period of time was commensurate with a proper award for slander of title in these facts. An appellate court may affirm a trial court if the correct result is reached, even if the trial court reached the result for the wrong reasons. *Puckett v. Stuckey*, 633 So.2d 978, 980 (Miss.1993). Finally, the court determined punitive damages

were not appropriate because such damages are largely a matter for the finder of fact, and Southern's conduct did not demonstrate malice or reckless disregard for Mason's rights. *See Aqua-Culture Techs., Ltd. v. Holly*, 677 So.2d 171, 185 (Miss.1996); *Fought v. Morris*, 543 So.2d 167, 173 (Miss.1989).

## II.

## THE PETITION FOR CERTIORARI

¶16. In her petition for certiorari, Mason avers that she has incurred attorneys' fees and has withdrawn money from her retirement fund in order to repay Southern. She calculates her losses, including attorneys' fees and other losses, as much greater than the $1,500 figure used by the Court of Appeals as the approximate value of the use of Southern's money. She fears that the Court of Appeals has set a precedent that an innocent party must repay erroneously paid funds without deducting the costs of same and that she has been penalized by the necessity of having to appeal the chancellor's judgment. She asks that we remand this matter to the trial court, with instructions to conduct a hearing for a proper determination of her losses. Mason does not press her claim for punitive damages in the petition for certiorari.

## III.

## ANALYSIS

¶17. Our point of contention with the plurality opinion of the Court of Appeals is its finding that Mason proved a cause of action for slander of title. Slander of title has been defined in the context presented here as the "malicious filing for record of an instrument known to be inoperative, and which disparages the title of land."*Dethlefs v. Beau Maison Dev. Corp.,* 511 So.2d 112, 117 (Miss. 1987). The chancellor made no finding of maliciousness by Southern, but instead found both parties at fault. Furthermore, the record does not present enough facts to make a finding of maliciousness on appeal. Given that the task of review is to correct clear error or application of an erroneous legal standard, we do not disagree with the chancellor's failing to find maliciousness or slander of title. *Kennedy v. Metro. Life Ins. Co.*, 759 So.2d 362, 364 (Miss. 2000). This Court gives a chancellor's findings great deference. *Bank of Miss. v. Hollingsworth*, 609 So.2d 422, 424 (Miss. 1992).

¶18. The chancellor fashioned an equitable remedy based on the available evidence. That remedy is consistent with the body of common law on the equitable principles of unjust enrichment. This Court has said:

> Money paid to another by mistake of fact, although such mistake may have been caused by payor's negligence, may be recovered from the person to whom it was paid, in an action for money had and received. The ground on which recovery is allowed is that one receiving money paid to him by mistake should not be allowed to enrich himself at the expense of the party who paid the money to him by retaining it, but in equity and good conscience should refund it. In order that this rule may apply, the party to whom the payment mistake was made must be left in the same situation after he refunds it as he would have been left had the payment to him not been made.

*Milliken & Michaels, Inc. v. Fred Netterville Lumber Co.*, 676 So.2d 266, 269 (Miss. 1996) (citations omitted)(quoting *Bessler Movable Stairway Co. v. Bank of Leakesville*, 140 Miss. 537, 106 So. 445 (1925)).

¶19. Those principles are applicable here. In addition, Southern alleged and the chancellor ruled that Mason made no effort to repay the money. Mitigation of damages is an affirmative defense. ***Wall v. Swilley***, 562 So.2d 1252, 1258 (Miss. 1990). There was testimony that Southern had arranged for Mason to obtain a replacement loan from her old mortgagor. If Mason had accepted that option, clearly her damages would have been less than she presently claims. The manifest error standard applies to review of damage awards by a chancellor. That standard applies despite an appellate court's inclination to award more or less. ***Edge v. City of Booneville***, 226 Miss. 108, 109, 83 So.2d 801, 802 (1955).

¶20. The trial court was clearly wrong in its order that Southern could foreclose its mortgage if Mason did not repay the money within thirty days. The fact is that, by mutual agreement to cancel or annul, there was no mortgage to foreclose. As the Court of Appeals correctly observed, the attempted foreclosure of an invalid mortgage was the fault for which Southern was required to forfeit the time value of its money. Mason was obligated to repay the money, and she has now done so. Whether by enforcement of a judgment lien or a mortgage lien, that result was all but inevitable. It was not an issue below, and Mason made no showing that she would be required to use her retirement money to pay this debt, to the exclusion of other alternatives.

¶21. For these reasons, we (1) reverse the judgment of the Court of Appeals, (2) reverse the trial court's judgment to the extent that it authorized Southern to foreclose, and (3) affirm the judgment of the chancellor in all other respects.

¶22. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE CHANCERY COURT OF BENTON COUNTY IS AFFIRMED IN PART AND REVERSED IN PART**.

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB AND DIAZ, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**