# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00728-COA

**MICHAEL AARON NOWELL**                                                 **APPELLANT**

**v.**

**CYNTHIA STEWART F/K/A CYNTHIA**                                   **APPELLEE**
**NOWELL**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/01/2020 |
| TRIAL JUDGE: | HON. JOHN C. McLAURIN JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN S. GRANT IV |
| ATTORNEYS FOR APPELLEE: | HEATHER MARIE ABY |
| | KATHLEEN ELIZABETH CARRINGTON |
| | DONNA BROWN JACOBS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 02/08/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., WILSON, P.J., AND McCARTY, J.

### CARLTON, P.J., FOR THE COURT:

¶1.     Michael Nowell and Cynthia Stewart divorced in 2013.  In 2016, Cynthia filed a "complaint for modification" of Michael's child-support obligation.  The Rankin County Chancery Court ultimately granted Cynthia's request for an increase in child support. Michael now appeals from the chancellor's judgment, arguing that Cynthia failed to prove any material or unforeseen change in circumstances since the original child-support order.

¶2.     After our review, we find that the chancellor did not abuse his discretion in determining that Cynthia met her burden of proving a material change in circumstances since the original child-support order, thus warranting an increase in child support.  We therefore

affirm the chancellor's judgment of modification.

**FACTS**

¶3.     Cynthia and Michael married in 1999.  Their marriage produced a daughter, H.G.N.,[1] who was born in 2002.  The record shows that around 2010, H.G.N. was diagnosed with autism spectrum disorder.[2]

¶4.     In 2013, Cynthia and Michael divorced.  The judgment of divorce incorporated the parties' Marital Dissolution Agreement (MDA).  Per the MDA, Cynthia received physical custody of H.G.N., with the parties sharing joint legal custody, and Michael received standard visitation.  Michael agreed to pay Cynthia $590 per month in child support for the first three years, and then beginning in January 2016, Michael would pay $1,000 per month in child support until H.G.N. turned twenty-one years old.

¶5.     As for H.G.N.'s medical bills, the MDA provided that Cynthia was responsible for H.G.N.'s monthly healthcare premiums.  However, Michael and Cynthia were each to pay one-half of the costs of H.G.N.'s healthcare and deductibles that were not covered by her insurance.

---

[1] We use initials to protect the minor child's privacy.  At the time of the June 16, 2020 trial, H.G.N. was one month shy of turning eighteen years old.

[2] H.G.N.'s medical records from 2010 reflect that she was diagnosed with "Asperger's Disorder."  Asperger's Disorder is a previously used diagnosis on the autism spectrum.  In 2013, Asperger's Disorder "became part of one umbrella diagnosis of autism spectrum disorder in the Diagnostic and Statistical Manual of Mental Disorders 5 (DSM-5)." Autism Speaks, *What is Asperger's Syndrome?*, https://www.autismspeaks.org/types-autism-what-asperger-syndrome (last visited Feb. 8, 2022).  For the purpose of continuity, we will solely refer to H.G.N.'s diagnosis as autism spectrum disorder.

¶6. In 2016, Cynthia filed a complaint for child-support modification and contempt. In her complaint, Cynthia alleged that since the parties' judgment of divorce and the MDA, a material change in circumstances had occurred that warranted an increase in Michael's child-support obligation; namely, "[H.G.N.] is now older, larger, involved in more activities and pastimes, and the overall general costs of raising said children has increased." Cynthia also requested a modification of Michael's visitation schedule. In response, Michael filed a counter-complaint for modification and contempt seeking sole physical custody of H.G.N.

¶7. A trial was held in June 2018. During the first two-and-a-half days of trial, the chancellor heard testimony from (1) Fred Davis, a licensed professional counselor appointed by the chancellor, (2) Amy Arnot, a licensed clinical social worker who provided therapy to H.G.N. from 2016 to 2018, (3) Dr. Mark Webb, H.G.N.'s treating psychiatrist, and (4) Cynthia.

¶8. In an unusual turn of events, the record shows that before Cynthia finished her case-in-chief, the chancellor suspended the trial sua sponte. The chancellor explained that "it has come to the . . . court's attention that there are certain outside influences that may be working in this case that need to be investigated before the court can proceed to hear anymore testimony regarding the issues that are presented."[3] The chancellor then entered an order on June 8, 2018, sealing the case, imposing a gag order, and suspending the trial "so that an investigation may be had into outside attempts at seeking to influence the Court."

---

[3] The record provides no further explanation as to the "outside influences" issue.

¶9. Two years later on June 16, 2020, the parties filed a joint stipulation with the chancellor limiting the issues for the remainder of the trial. Specifically, the parties agreed to permit the chancellor to decide whether the following provisions should be modified and, if so, how each provision should be modified: (1) child support, (2) H.G.N.'s health insurance and uncovered health expenses, (3) the dependent income-tax deduction, (4) life insurance for H.G.N., (5) retroactive child support, (6) past medical expenses, (7) guardian ad litem fees, (8) the court-appointed counselor's fees, and (9) attorney's fees. The parties withdrew all other claims.

¶10. On June 16, 2020, the trial resumed, and the chancellor limited the trial to the stipulated issues. At the commencement of the trial, the chancellor announced:

> I was presented this morning with both parties' [Rule] 8.05 financial declaration[s]; and I was asked to give an opinion based upon those financial declarations as to what I would do were the testimony to bear out what they contain, specifically, as to [Michael's] ability to pay support for [H.G.N.] and to the reasonable expenses of [H.G.N.] which [Cynthia] claims.

The chancellor clarified that "the ability of [Michael] to pay the reasonable expenses of [H.G.N.] is not in question in this court's opinion," explaining that "[Michael] makes sufficient money and has sufficient income . . . to pay the reasonable expenses of [H.G.N.]." The chancellor again emphasized that "[t]he only real issue before the court is what are [H.G.N.'s] reasonable monthly expenses."

¶11. The chancellor acknowledged that according to Cynthia's Uniform Chancery Court Rule 8.05 financial statement, "[H.G.N.'s] reasonable monthly expenses are $4,602.52."

4

However, the chancellor stated that he disagreed with Cynthia's claim that H.G.N.'s monthly expenses amounted to $4,602.52. The chancellor instead opined that $2,000 per month was a sufficient amount for H.G.N.'s monthly expenses. The chancellor also found that Cynthia's demand for back child support in the amount of $2,000 per month for the past three years, for a total lump sum of $30,000, "is a reasonable sum to be paid by [Michael] to [Cynthia]." The chancellor further found that the $5,600 that Cynthia sought for back medical expenses "is reasonable and should be paid."

¶12. After the chancellor stated his preliminary opinion, he heard testimony from Michael and Cynthia. We will discuss the parties' testimony at length in our analysis below.

¶13. At the end of the trial, the chancellor determined that a "substantial and material change in circumstances" had occurred since the entry of the judgment of divorce. The chancellor accordingly found that "an increase of [Michael's] monthly child support obligation from $1,000 to $2,000 a month is not unreasonable. It's supported by the evidence." The chancellor also ordered Michael to pay Cynthia a lump sum of $30,000 in back child-support payments.

¶14. The chancellor further ordered Michael to pay as follows: one-half of any medical insurance premiums for H.G.N.; one-half of any non-covered medical expenses for H.G.N.; $5,600 for back medical expenses; vision and dental insurance premiums for H.G.N.; and the cost of H.G.N.'s senior-year tuition after any grants and scholarships have been applied. The chancellor acknowledged that Michael claimed he paid $900 per month for H.G.N.'s private-

5

school tuition, but the chancellor held that whether Michael actually paid this amount "hasn't been proven in any way, shape, form, or fashion to me."

¶15. On July 1, 2020, the chancellor entered a judgment of modification memorializing the findings from his bench opinion.

¶16. Michael now appeals.

## STANDARD OF REVIEW

¶17. We recognize that "a chancellor is afforded broad discretion in the area of modification of child-support obligations, and we will reverse only when the chancellor was manifestly in error in a finding of fact, or if there has been an abuse of discretion, or when an erroneous legal standard was applied." *Plummer v. Plummer*, 235 So. 3d 195, 200 (¶20) (Miss. Ct. App. 2017). "The process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review." *Kilgore v. Fuller*, 741 So. 2d 351, 353 (¶4) (Miss. Ct. App. 1999). Legal questions are reviewed de novo. *Cadigan v. Sullivan*, 301 So. 3d 779, 783 (¶19) (Miss. Ct. App. 2020).

## DISCUSSION

### I. Child-Support Modification

¶18. Michael argues that Cynthia failed to meet her burden of proving any material and unforeseen change in circumstances since the judgment of divorce and original child-support order. Michael asserts that the parties' MDA contemplated H.G.N.'s future needs and

6

expenses.

¶19.    Michael further argues that the chancellor erred in relying on H.G.N.'s special needs as a basis to increase support.  Michael maintains that because H.G.N. was diagnosed with autism spectrum disorder prior to the parties' divorce, H.G.N.'s medical expenses relating to her diagnosis were foreseeable.  Michael also submits that the chancellor erred by failing to address the factors set forth in *Adams v. Adams*, 467 So. 2d 211, 215 (Miss. 1985), for determining whether a material change in circumstances had occurred that warrants a modification of child support.

¶20.    Child-support orders can be modified when there has been "a substantial or material change in the circumstances not reasonably foreseeable at the time of the most recent support decree." *Best v. Oliver*, 296 So. 3d 140, 142 (¶9) (Miss. Ct. App. 2020).  The party seeking the modification bears the burden of showing "a material change of circumstances of one or more of the interested parties, whether it be the father, mother, or the child(ren), arising subsequent to the original decree." *Wallace v. Bond*, 745 So. 2d 844, 848 (¶18) (Miss. 1999). The Mississippi Supreme Court has clarified that "[t]he circumstances that lead to the material change that bring rise to modification of child support . . . must not have been reasonably foreseeable at the time of the divorce." *Id*. at 848-49 (¶19).

¶21.    As to whether the circumstances leading to the material change were reasonably foreseeable at the time of the divorce, we recognize that "[w]hile it is foreseeable that expenses increase with the natural growth of a child, the amount of the increase is not." *Best*,

7

296 So. 3d at 142 (¶10). Therefore, "[i]t would be unfair to require under the foreseeability test that the initial child-support award include anticipated future increased expenses." *Id*. "Because it is impossible for a court to foresee in the initial support award what allowances to make for a child years into the future, we leave that for modification proceedings." *Id*.

¶22. The supreme court has provided several factors for a chancellor to consider in determining whether a modification of child support is warranted:

> (1) increased needs caused by advanced age and maturity of the children (2) increase in expenses, and (3) inflation factor. Other factors include (4) the relative financial condition and earning capacity of the parties, (5) the health and special needs of the child, both physical and psychological, (6) the health and special needs of the parents, both physical and psychological, (7) the necessary living expenses of the father, (8) the estimated amount of income taxes the respective parties must pay on their incomes, (9) the free use of a residence, furnishings, and automobile and (10) such other facts and circumstances that bear on the support subject shown by the evidence.

*Ravenstein v. Ravenstein*, 167 So. 3d 210, 218-19 (¶17) (Miss. 2014) (quoting *Adams*, 467 So. 2d at 215); *see also Caldwell v. Caldwell*, 579 So. 2d 543, 547 (Miss. 1991). Michael argues that the chancellor *must* consider these factors for determining whether a modification of child support is warranted. However, in *Adams*, the supreme court stated that these factors "*may* be included as supportive of financial change." *Adams*, 467 So. 2d at 215 (emphasis added). In *Caldwell*, the supreme court reiterated that these factors "*may* be considered in determining whether a material change has taken place." *Caldwell*, 579 So. 2d at 547 (emphasis added). Additionally, this Court has held that "a chancellor is not required to consider every conceivable element in deciding to adjust child support." *Riddick v. Riddick*,

8

906 So. 2d 813, 819 (¶17) (Miss. Ct. App. 2004). As stated, we review a chancellor's modification of child support under an abuse-of-discretion standard of review. *Plummer*, 235 So. 3d at 200 (¶20).

¶23. The record before us shows that at the commencement of the trial on the stipulated issues, the chancellor announced that he was "asked to give an opinion based upon [the parties' Rule 8.05 statements] as to what [he] would do were the testimony to bear out what they contain," specifically regarding Michael's ability to pay and H.G.N.'s reasonable monthly expenses as asserted by Cynthia. The chancellor clarified that "the ability of [Michael] to pay the reasonable expenses of [H.G.N.] is not in question in this court's opinion"; rather, the sole issue before the chancellor was the determination of H.G.N.'s reasonable monthly expenses.

¶24. The chancellor then provided his initial opinion based solely on the parties' Rule 8.05 statements. The chancellor stated that on Cynthia's Rule 8.05 statement, she alleged that H.G.N.'s reasonable monthly expenses amounted to $4,602.52 per month. Prior to hearing testimony from the parties, the chancellor expressed that he disagreed with that amount, stating "[t]he court does not believe that [H.G.N.] requires that much money a month to support her reasonable, necessary expenses of living." The chancellor instead opined that "a figure of $2,000 a month is adequate and sufficient to pay for [H.G.N.'s] expenses from now until she turns 21 years of age." The chancellor explained that he arrived at the figure of $2,000 by "consider[ing] the income of [Michael], the income of [Cynthia], [and] the

9

reasonable needs of [H.G.N.] going from here until she reaches the age of majority in three years."

¶25. Regarding Cynthia's claim for back child-support payments, the chancellor opined that the child-support payments "should have been increased a long time ago," and he therefore found that Cynthia's demand of $2,000 per month for the past three years, for a total lump sum of $30,000, "is a reasonable sum to be paid by [Michael] to [Cynthia]." The chancellor also opined that Michael should pay one-half of any medical insurance premiums for H.G.N. and that each party should pay for one-half of any non-covered medical expenses. The chancellor further found that the $5,600 that Cynthia sought for back medical expenses "is reasonable and should be paid." The chancellor specified that Michael should pay "half of anything that [H.G.N.'s psychiatrist] charges" for H.G.N.'s treatment.[4]

¶26. The chancellor then acknowledged that Michael "disagrees with those figures and disagrees with that amount." The chancellor stated that he "would like to hear from [Michael] as to why he believes that those amounts would be unfair or unjust for him to pay for his daughter's support."

---

[4] During the proceedings and on appeal, Michael has expressed that he objects to H.G.N.'s seeing Dr. Webb, and Michael maintains that because he has joint legal custody of H.G.N., "he should have had a say in whether Dr. Webb . . . should be the treating physician." However, this Court has held that "the custodial parent may determine the child's upbringing, including his education and health and dental care. Such discretion is inherent in custody. It is vested in the custodial parent." *Taylor v. Timmons (In re C.T.)*, 228 So. 3d 311, 316 (¶9) (Miss. Ct. App. 2017) (quoting *Clements v. Young*, 481 So. 2d 263, 267 (Miss. 1985)).

¶27.   After hearing testimony from the parties, the chancellor ruled from the bench that an increase in Michael's child-support payment was warranted.   The chancellor increased Michael's payment amount to $2,000 per month, explaining that this amount was supported by the evidence and was not unreasonable.[5]   The chancellor further clarified that "[t]he judgment says it's due on the first day of the month, not at the end of the month; and there's no reason why you can't comply with that order."[6]

---

[5] The supreme court has held that "in a child-support modification decision, the chancellor first must find that a material change in circumstances warrants a modification before determining the amount of child support" pursuant to the child-support guidelines set forth in Mississippi Code Annotated section 43-19-101(1) (Rev. 2015). *Lewis v. Pagel*, 172 So. 3d 162, 176-77 (¶33) (Miss. 2015).   However, the chancery court may deviate from the statutory guidelines if the court makes "an on-the-record finding that it would be unjust or inappropriate to apply the guidelines in the instant case."   *Garcia v. Garcia*, 97 So. 3d 109, 112 (¶12) (Miss. Ct. App. 2012) (quoting *Chesney v. Chesney*, 910 So. 2d 1057, 1061 (¶7) (Miss. 2005)).   At an April 2, 2020 motion hearing, the chancellor found that because Michael's income exceeded $800,000, a strict application of section 43-19-101(1) would require Michael to pay approximately $9,000 per month.   The chancellor stated, "I just don't believe that this child has those kind of living expenses. . . . I just don't believe that."   The chancellor accordingly announced that "this is going to be a non-guidelines case," explaining that "this isn't your standard child support setting situation. This is one . . . that's extremely exceptional and aberrational" due to Michael's income.   Additionally, at the commencement of the June 16, 2020 trial, the chancellor reiterated, "I'm not applying the statutory guidelines because I believe they're aberrational in this case because of the income which Mr. Nowell receives from all sources, not just from his salary at the insurance company, but I have to take into account all the income that he receives."

[6] Michael claims that the chancellor's requirement that he make his support payments on the first day of the month is unduly burdensome.   However, as acknowledged by the chancellor, the parties' MDA specifies the first day of the month when discussing child-support payments: "Husband shall pay five hundred ninety dollars ($590) per month to wife as child support beginning March 1, 2013. Effective January 1, 2016, Husband shall pay to Wife child support of one thousand dollars ($1,000) per month."   We find that the chancellor was within his discretion to instruct Michael to make the child-support payments on the first day of the month.

11

¶28. In determining that a modification of Michael's child-support obligation was warranted, the chancellor found "that there has been a substantial and material change in circumstances . . . since the divorce [judgment] was entered." In support of his finding, the chancellor explained that H.G.N. "[is] older, things are more expensive, her needs have increased." Referring to H.G.N.'s autism-spectrum-disorder diagnosis, the chancellor emphasized that H.G.N. "has extensive medical – psychiatric expenses that other children don't have." The chancellor explained that "[H.G.N.'s] needs are different from any other children her age because of her situation," and therefore "she has different things that she is involved in that make her happy and make her secure than other girls similarly situated, but we have to take this case as we find it."

¶29. The chancellor ordered Michael to pay Cynthia $5,600 for H.G.N.'s unpaid medical expenses and a lump sum of $30,000 for thirty months of back child-support payments. The chancellor recognized that "ordinarily in a modification of child support[,] an increase is only awarded prospectively." The chancellor stated, however, that because this case commenced four years ago and because Michael advanced claims during the litigation that made the litigation drag out, "the court believes that this is an unusual or aberrational situation where back child support should be awarded." The chancellor further ordered Michael to pay as follows: one-half of any medical insurance premiums for H.G.N.; one-half of any non-covered medical expenses for H.G.N.; $5,600 for back medical expenses; and vision and dental insurance premiums for H.G.N. The chancellor found that H.G.N. benefits from the

12

treatment provided by her psychiatrist.

¶30. The chancellor also ordered Michael to pay H.G.N.'s tuition for her senior year in high school. The chancellor acknowledged Michael's testimony that he voluntarily paid for H.G.N.'s private-school tuition; however, the chancellor stated that Michael did not prove "in any way, shape, form or fashion to me that he's paid anything. He brought no records or no receipts with him today. That's just simply his statement to the court." The chancellor admitted that "[t]here may be some tuition that [Michael] is paying," but the chancellor found that his actual tuition payment "doesn't nearly amount to what he's claiming that he has paid." The chancellor explained that he "asked [Cynthia] specifically had she received any money from [Michael] other than the $1,000 a month that he's obligated to pay, and she said, 'No.'" The chancellor stated that although Michael testified that he pays $25,000 per year for child support for H.G.N., which includes her private-school tuition, Michael did not provide any proof that he had paid this amount. The chancellor explained, "I have proof that he's paying a thousand dollars a month, out of which almost 200 goes to health insurance, but I don't have any proof that he's paying anything over that."

¶31. On July 1, 2020, the chancellor entered a judgment of modification memorializing his findings and ruling from the bench. In his judgment, the chancellor stated that "a substantial and material change in circumstances has occurred with regard to the payment of child support of [H.G.N.]" and that Michael "has sufficient income to pay the reasonable needs of [H.G.N.,] and he is currently not paying enough in monthly child support."

13

¶32.   The supreme court has held that when reviewing a chancellor's award of child support, the appellate court must examine the record to see if sufficient evidence supports the chancellor's findings. *Powell v. Powell*, 644 So. 2d 269, 275 (Miss. 1994).  We therefore turn to examine the record and determine whether it contains sufficient evidence to support the chancellor's findings.

¶33.   H.G.N.'s medical records submitted into evidence show that in July 2010, H.G.N. received a diagnosis of autism spectrum disorder, a low-average intelligence, specific learning disabilities in math and reading, and separation anxiety disorder.  In 2017, Dr. Webb documented that H.G.N. has "Autism Spectrum Disorder or Asperger's Disorder."  Dr. Webb also diagnosed H.G.N. with depression and obsessiveness, which he stated were common symptoms of autism spectrum disorder.

¶34.   H.G.N.'s school records reflect that in 2014 and 2018, she was assessed for an individual education plan (IEP) as a result of her autism-spectrum-disorder diagnosis.  The school records indicate that in 2014, H.G.N. received special-education eligibility due to her autism-spectrum-disorder diagnosis.  The 2014 IEP results reflect that "[H.G.N.'s] disability impacts her participation in general education by preventing her from performing to grade level in the general education classroom due to her deficits in grade level math and grammar skills, completing tasks within a reasonable time frame, and keeping pace with the general education curriculum."  In 2018, H.G.N. was assessed for another IEP, and the results revealed that she has a low IQ.  The 2018 testing also showed that H.G.N.'s autism spectrum

14

disorder severely affects her social behavior.

¶35. During the initial trial,[7] the chancellor heard testimony from Dr. Webb regarding H.G.N.'s autism-spectrum-disorder diagnosis. Dr. Webb explained that autism is a "developmental disorder" and a "lifelong illness." Dr. Webb testified that H.G.N.'s diagnosis affects her processing speed, explaining that H.G.N.'s "processing speed in testing was a 2 out of 100, which means she's in the extremely low percentile of processing information, and that's why we have sort of the mass scores that are fourth to fifth-grade level." Dr. Webb testified that due to H.G.N.'s low processing speed, he did not recommend that she drive a vehicle. Dr. Webb also testified that an IEP revealed that H.G.N.'s intelligence is "below average" and that she has special education needs. Dr. Webb opined that based on H.G.N.'s diagnosis and her educational limitations, "she's going to need help and treatment and supervised living of some kind probably for the rest of her life."

¶36. Dr. Webb also explained that people with autism spectrum disorder "will be overly connected to something [and] that's all they'll want to talk about." Dr. Webb testified that for H.G.N., that "something" is animals, and he stated that "she's fixated on them."

¶37. After the chancellor resumed the trial, he heard testimony from Michael and Cynthia. Michael testified that the parties' MDA contained provisions that "contemplated the future needs of [H.G.N.]" Michael explained that "[he] had an increase in child support planned

---

[7] At the time of the initial trial in June 2018, H.G.N. was approximately fifteen years old.

in our [MDA]." Michael also emphasized that other than H.G.N.'s need to attend a special private school, H.G.N. "[does not] have any special needs that have changed" since the parties divorced. As stated, H.G.N. was diagnosed with autism spectrum disorder prior to the parties' divorce. The parties' MDA reflects that Michael paid Cynthia $590 per month in child support for the first three years after the divorce, and then beginning in January 2016, Michael would pay $1,000 per month in child support until H.G.N. turned twenty-one years old.

¶38. Michael testified that after he and Cynthia divorced, he "gave [Cynthia] a house, gave her a paid-for car so that [H.G.N.] would have a place to live and [H.G.N.] would have . . . good transportation." The parties' MDA reflects that Michael purchased a house for Cynthia and that after three years, Cynthia had the option to move out of the house and receive $100,000, or she could keep the house and request that Michael pay in full the entire mortgage on the house. Per the MDA, Michael paid Cynthia $10,000 to assist her in moving into the new house. The MDA also stated that Michael would continue to pay Cynthia's current yearly salary for her employment at his insurance agency for a period of three years. Michael testified that Cynthia's salary was approximately $42,000 per year. Michael testified that he also paid for Cynthia's health insurance for three years. Michael estimated that the value of everything he provided to Cynthia at the end of their marriage amounted to approximately $450,000. Michael explained that everything he provided to Cynthia "was to contemplate future needs of [H.G.N.], you know, because without having to have housing

16

or without having to have transportation—that's two of the largest expenses anyone ever takes on, I guess." Michael reiterated that "[t]he amount of money we agreed on in the beginning was to carry this thing out so that we wouldn't have to keep going through this legal hassle and cost and all the way through the line."

¶39. Additionally, Michael testified that he voluntarily paid $900 per month for H.G.N.'s private-school tuition without any requirement to do so. However, Michael's Rule 8.05 financial statement does not reflect this cost. Michael estimated that between the monthly $1,000 child-support payments, private-school tuition and uniforms, dental and vision insurance, and additional bills, he pays Cynthia approximately $25,000 in child support each year. Michael also testified that he purchased a car for H.G.N. to drive when she turned sixteen years old, but because H.G.N. did not want to drive, he sold the car.

¶40. The chancellor next heard testimony from Cynthia. Cynthia testified that H.G.N.'s expenses had increased since 2016 "because . . . the things she enjoys to do increased[,]" explaining that "things are more expensive." Cynthia stated that "[H.G.N. has] gotten older. She just wants to do more. She wants to go to movies. She wants to do things like that that cost money." Cynthia explained that "[H.G.N.] is accustomed to a lifestyle that when her father and I were married, she pretty much got anything she wanted; and I've tried to maintain a lifestyle that pays for her interests[.] . . . [D]o I agree that everything I have spent on her she is required? Absolutely not."

¶41. As far as specific expenses, Cynthia testified that she pays $750 per visit for H.G.N.'s

17

psychiatrist appointments with Dr. Webb, and H.G.N. sees Dr. Webb approximately every six weeks. (Dr. Webb confirmed the costs and the regularity of H.G.N.'s visits in his testimony.) Cynthia testified that H.G.N. "adores" Dr. Webb and that she leaves her visits with him "happy" and "laughing." Cynthia testified that H.G.N.'s monthly clothing expense is $225. She explained due to H.G.N.'s sensory issues stemming from her autism spectrum disorder, H.G.N. preferred to wear cotton t-shirts. Cynthia testified that the cost of her t-shirts ranges from $30 to $70 per shirt. Cynthia also included monthly expense amounts for H.G.N.'s art supplies, haircuts, and personal hygiene products. Regarding the expense of H.G.N.'s eyebrow manicuring, Cynthia testified that this type of personal maintenance helped H.G.N.'s self-esteem and was therapeutic for her.

¶42. Cynthia testified that H.G.N. cannot drive, so Cynthia pays a driver $800 per month, plus gasoline expenses, to drive H.G.N. to school, appointments, and other activities as needed. In addition to this amount, Cynthia also pays a retainer for another transportation service in case of an emergency. Cynthia testified that she took a new job with less pay but more flexible hours so that she could be close to H.G.N.'s school. When questioned as to why Cynthia paid for someone else to drive H.G.N. to school when Cynthia was working close by, Cynthia clarified that she wanted to be close by in case of an emergency. She also explained that the driver "picks up [H.G.N.,] and they do things after school."

¶43. Cynthia testified she spends approximately $1,040 per month on H.G.N.'s vitamins and animal feed for H.G.N.'s numerous pets. Cynthia testified that H.G.N.'s pets include

18

dogs, "a multitude of chickens," lizards, pigeons, and mealworms. According to Cynthia, veterinary expenses for H.G.N.'s pets amount to $220 per month. Cynthia explained that because of H.G.N.'s autism spectrum disorder, animals are therapeutic and "have a very calming effect" on H.G.N. Cynthia testified that "[f]or a child who doesn't have a whole lot of friends, [her pets] are her companions."

¶44. Cynthia admitted that Michael paid for H.G.N.'s private-school tuition, and she testified that the tuition cost approximately $900 per month. Cynthia clarified that H.G.N. received a scholarship for the prior school year, and as a result, Michael did not pay any tuition for that year. Regarding Michael's testimony that he pays $25,000 for H.G.N. each year, the chancellor asked Cynthia, "Is he giving you $25,000 a year?" Cynthia answered, "No, sir. I get a thousand dollars a month; and out of that thousand dollars a month, I pay almost $200 in health insurance premiums alone."

¶45. As previously acknowledged, Michael argues that because H.G.N. was diagnosed with autism spectrum disorder prior to the parties' divorce, her medical expenses relating to this diagnosis were foreseeable. Michael also asserts that Cynthia's general allegations such as "things are more expensive" and "[H.G.N. has] gotten older" are not enough to meet her burden of proof to show a material change in circumstances. This Court has held that "[w]hile the increase in a child's age alone is an indicator that an increase in support may be warranted, it is not, standing alone, evidence of a material change in circumstances." *McNair v. Clark*, 961 So. 2d 73, 80 (¶29) (Miss. Ct. App. 2007). Rather, "[t]o find a material change

19

in circumstances based upon increased expenses, the amount of those expenses must not have been foreseeable at the time of the original order, and the parent seeking an increase in child support must state specifically the basis and amounts of those increased expenses." *Id*. Specifically, "the movant must show that increased financial obligations have eaten away so significantly at the purchase power of the existing child support award that it no longer meets the needs of the child." *Turner v. Turner*, 744 So. 2d 332, 336 (¶17) (Miss. Ct. App. 1999). "This may be done by showing a significant increase in the cost of goods or services or by a specific showing of needs not previously existing." *Id*. A "general pronouncement" that expenses for a child have increased "does not rise to the level of a material change in circumstances warranting modification of child support." *Brawdy v. Howell*, 841 So. 2d 1175, 1179 (¶14) (Miss. Ct. App. 2003).

¶46.    In *Riddick v. Riddick*, 906 So. 2d 813, 820 (¶21) (Miss. Ct. App. 2004), this Court reversed the chancellor's order increasing the husband's child-support obligation. In modifying the child-support order, the chancellor acknowledged the advanced age of the children at issue and heard testimony from the wife regarding the increased needs of the children, which included expenses for sports, providing a vehicle and maintenance of the vehicle for a child of driving age, a higher grocery bill, and more expensive clothing for the children. *Id*. at (¶19). However, this Court found that the wife "has not documented any of these expenses" and explained that "[g]eneral allegations of increased needs or expenses will not suffice. Expenses must be proved with particularity." *Id*. (citing *Magee v. Magee*, 755

20

So. 2d 1057, 1060 (¶11) (Miss. 2000); *Mullen v. Mullen*, 246 So. 2d 923, 924 (Miss. 1971)). This Court also held that "assuming [the wife's] claims that her expenses increased are true, we are unable to see how these expenses were unanticipated at the time of the divorce decree." *Id*.

¶47. In *McNair*, 961 So. 2d at 81 (¶30), this Court also reversed a chancellor's modification of child support after finding that the mother[8] failed to meet her burden of showing a material change in circumstances—specifically, that the children's increased expenses were unforeseeable at the time of the parties' original child-support order. The parties in that case did not testify at the hearing before the chancellor and instead relied on the oral arguments provided by their attorneys. *Id*. at 80 (¶26). The documentary evidence before the chancellor "consisted of the first order of child support, the parties' Rule 8.05 financial statements, a single paycheck stub belonging to [the father], and the documents detailing the medical expenses accrued as a result of one of the children's brain surgeries." *Id*. The mother's Rule 8.05 financial statement listed "several activities in which the three children are involved, but . . . [it provided] no evidence to indicate whether these activities were unforeseeable or whether the amount necessary to sustain those activities was unforeseeable." *Id*. at 80-81 (¶30). This Court found that "[t]he only evidence before the chancellor was the increased ages of the children and a line-item statement in [the mother's] Rule 8.05 financial statement that the children were involved in extra-curricular activities."

---

[8] The parties were never married. *McNair*, 961 So. 2d at 75 (¶2).

*Id.* at 81 (¶30). This Court stated that evidence regarding the unforeseeability of the children's activities and unforeseeability of the costs of those activities "could easily have been supplied through testimony from [the mother], had she testified." *Id.* at (¶30). This Court reiterated that "the burden rested with [the party seeking modification] to prove an increase in expenses that constituted a material change in circumstances." *Id.* This Court ultimately held that "[w]ithout evidence of unforeseeability in either the activities or the amount of those activities . . . the record cannot support the chancellor's finding that the increased ages of the children constitutes a material change in circumstances." *Id.*

¶48.    In the recent case of *Bennett v. Bennett*, 316 So. 3d 651, 656 (¶23) (Miss. Ct. App. 2021), this Court found no abuse of discretion in the chancellor's order modifying the husband's child-support obligation for his twin sons. In that case, the chancellor considered the factors in *Adams*, 467 So. 2d at 215, and held that the husband's "'slight increase in income' and 'increase in needs as it related to the twins' constituted a material change in circumstances warranting an increase in child support." *Id.* The chancellor found that the wife had presented "substantial testimony and proof of increased expenses of the [twins] including but not limited to optical and dental expenses." *Id.* The wife also testified that the husband had not exercised regular visitation with the twins, which resulted in an increase in the wife's expenses for the children. *Id.* at (¶21). The husband admitted that he had not exercised regular visitation. *Id.* After "consider[ing] the increase in optical and dental expenses along with the increased needs of the children due to their advanced age," the

22

chancellor accordingly increased the husband's child-support obligation. *Id*. at (¶23).

¶49. In the present case, our determination of whether the record contains sufficient evidence in support of the chancellor's judgment hinges on whether Cynthia met her burden of showing that H.G.N.'s increased expenses were unforeseeable at the time of the parties' divorce and whether Cynthia presented sufficient testimony and proof as to these increased expenses. *See McNair*, 961 So. 2d at 80 (¶29) ("To find a material change in circumstances based upon increased expenses, the amount of those expenses must not have been foreseeable at the time of the original order, and the parent seeking an increase in child support must state specifically the basis and amounts of those increased expenses."). After our review, we find that Cynthia provided extensive testimony regarding how H.G.N.'s autism-spectrum-disorder diagnosis has affected her needs, and therefore her expenses, as she has gotten older. In addition to her testimony regarding H.G.N's increased expenses, Cynthia provided a Rule 8.05 financial statement reflecting these expenses. She also attached a receipt of her Amazon.com purchases for H.G.N. H.G.N.'s education records and her medical records, as well as Dr. Webb's testimony regarding H.G.N.'s specific needs and abilities surrounding her diagnosis, provide further support that H.G.N.'s current expenses were unforeseeable at the time of the parties' divorce. As a result, we find that the record contains sufficient evidence in support of the chancellor's judgment of modification.

¶50. While the chancellor did not expressly list the *Adams* factors and articulate a finding as to each factor, the record shows that the chancellor did consider some, if not all, of the

23

factors. In modifying Michael's child-support obligation, the chancellor specifically addressed H.G.N.'s special needs, the incomes of the parties, the increased needs resulting from H.G.N.'s increased age, and an increase in H.G.N's expenses. *See Adams*, 467 So. 2d at 215. As in *Riddick*, "[w]e decline to hold the chancellor in error for not discussing every conceivable factor in deciding to increase [Michael's] child[-]support obligation." *Riddick*, 906 So. 2d at 819 (¶16).

¶51. After our review, we affirm the chancellor's judgment modifying Michael's child-support obligation, including the award of unpaid medical expenses and back child-support payments to Cynthia.

## II. Motion to Lift the Seal

¶52. During the June 2018 trial, the chancellor sua sponte suspended the trial due to an "outside influences" issue. The following day, June 8, 2018, the chancellor ordered the case to be sealed. The chancellor's order explained that the trial would be suspended until further order so that the court could investigate "outside attempts at seeking to influence the [c]ourt[.]" The order stated the pleadings would be sealed, and the chancellor also instituted a "gag order" providing that the parties "shall not discuss the facts surrounding this matter with anyone in the public."

¶53. On September 3, 2020, more than thirty days after the chancellor entered his final judgment, Cynthia filed a motion to remove the seal. Michael opposed the motion and filed a motion to dismiss for lack of jurisdiction. Cynthia failed to set a hearing on her motion to

24

remove the seal.

¶54. On November 12, 2020, Cynthia moved to unseal this case. Michael filed a motion in opposition. The supreme court passed the motion to unseal for consideration with the appeal, and the appeal was later assigned to this Court. On September 13, 2021, this Court entered an en banc order remanding this matter to the Rankin County Chancery Court for thirty days for the chancellor to provide his reasons for sealing this case. On September 29, 2021, this Court received a response from the chancellor explaining his reasons for sealing the case. The chancellor also stated that those reasons are now moot, and he has no objection to the seal being lifted. The chancellor explained as follows:

> On the third day of trial in this matter, it came to the [c]ourt's attention during witness testimony that alleged attempts had been made to influence the court's decision by outside parties. Simultaneously, an email was circulated by a member of the general public threatening certain witnesses. At that time, I found it was in everyone's best interest to suspend the trial and seal the file until investigations could be had into both the attempted court influence as well as the threatening email. Neither of the investigations were fruitful; therefore, the trial was rescheduled. I do not have an objection to the seal being lifted at this time, because the ultimate reasons for sealing it are moot.

¶55. The supreme court has articulated that "Mississippi law favors public access to public records." *Est. of Cole v. Ferrell*, 163 So. 3d 921, 925 (¶18) (Miss. 2012). We recognize that "[c]ourt filings are considered to be public records, unless otherwise exempted by statute." *Id*. at (¶15). However, courts have the discretion to "determine if nonexempt matters [such as court filings] should be declared confidential or privileged" and sealed from public access. *Id*. at (¶16). When determining whether the chancellor's decision to seal a case "is proper,

25

we review for an abuse of discretion." *Id*. at 924 (¶11).

¶56. Before sealing a record, a trial court must first "balanc[e] the parties' competing interests—the public's right of access versus confidentiality." *Id*.; *see also Butler Snow LLP v. Est. of Mayfield*, 281 So. 3d 1214, 1220 (¶27) (Miss. Ct. App. 2019). After our review in this case, we find "no indication the chancery court conducted the balancing test in any fashion." *Butler Snow*, 281 So. 3d at 1220 (¶29).

¶57. Regardless of whether the chancellor's decision to seal this case was proper, Mississippi Rule of Appellate Procedure 48(A)(b) provides this Court with the authority to seal this case at the appellate level. Rule 48(A)(b) states, in pertinent part, as follows:

> In the event that the appellate court shall determine that a case contains information the public disclosure of which will cause substantial harm to the welfare of a child or otherwise contains sensitive information the public disclosure of which will cause substantial harm, the appellate court may direct that such case be closed to public access and shall, upon order of the appellate court, be treated as a confidential case by the clerk.

¶58. This case contains significant confidential medical records and testimony relating to H.G.N. We find that H.G.N.'s privacy interest in maintaining the confidentiality of her medical records outweighs the public's right of access. Due to the sensitive nature of this medical evidence, we also find that the public disclosure of this information will cause substantial harm to H.G.N. We therefore deny Cynthia's motion to lift the seal, and we order that the case file remain sealed and treated as confidential. *See Mason v. S. Mortg. Co.*, 828 So. 2d 735, 738 (¶15) (Miss. 2002) ("An appellate court may affirm a trial court if the correct result is reached, even if the trial court reached the result for the wrong reasons.").

¶59. However, we lift the chancellor's gag order as it relates to this case. In so doing, we acknowledge that H.G.N.'s private medical records and private health information remain confidential and also protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (codified in part at 42 U.S.C. § 1320d-1 to d-7).

¶60. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., NOT PARTICIPATING.**